**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**JOANN JACKSON,**

                                    **Plaintiff,**                          **01-CV-00491A(Sr)**

**v.**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

                                    **Defendant.**

---

**DECISION AND ORDER**

        In accordance with 28 U.S.C. § 636(c), the parties have consented to
have the undersigned conduct all further proceedings in this case, including entry of
final judgment.  Dkt. #15

        Plaintiff commenced this action pursuant to 42 U.S.C. § 405(g), seeking
review of the final decision of the Commissioner of Social Security ("Commissioner"),
denying her application for social security disability insurance ("SSDI"), and
supplemental security income ("SSI"), benefits.  Dkt. #1.  The Commissioner moved for
judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c).  Dkt. #9.  The plaintiff also
moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c), seeking reversal
of the Commissioner's decision and remand for a new administrative hearing.  Dkt. #11.
For the following reasons, the Commissioner's motion is denied and the plaintiff's
motion is granted.

-1-

## PROCEDURAL BACKGROUND [1]

Plaintiff filed an application for SSI on November 12, 1998, claiming disability as of November 6, 1997 as a result of a schizo-affective disorder. T95-97, 107-117. Her application was denied initially and upon reconsideration. T69, 72. A hearing, as requested by plaintiff, was conducted before Administrative Law Judge ("ALJ"), Barry Anderson on January 11, 2000. T28. Plaintiff was accompanied by Christine Graef, a representative from the Erie County Department of Social Services. T30. On February 17, 2000, the ALJ issued a decision denying plaintiff's claim. T12-17. The ALJ's determination became the final decision of the Commissioner on May 18, 2001, when the Appeals Council denied plaintiff's appeal. T5.

## FACTUAL BACKGROUND

Medical Records

Plaintiff was admitted to the psychiatric unit at the Erie County Medical Center ("ECMC"), on November 22, 1997 following

> a long history of increasingly withdrawn behavior, decreased self care and isolation. Her symptoms have gotten worse in the past three weeks. On the day of admission, the patient became agitated, was screaming at the TV and her parents called 911.

T141. She was started on neuroleptic medication with gradual improvement, but remained "somewhat odd and distant with impoverished thought content." T141. Plaintiff's family was "extremely involved" and agreed to allow plaintiff to return home

---

[1] References to "T" are to the certified transcript of the administrative record filed by the defendant in this action. Dkt. #6.

even though she

> had discontinued her medications on her own, refusing to
> take them, insisting that she no longer had a problem.  She
> appeared superficially pleasant and cooperative, but had
> significant underlying hostility . . . .

T141.  She was also described as remaining "disorganized, superficially bright and
lacking in insight."  T142.  Plaintiff was discharged against medical advice on December
3, 1997, with a diagnosis of psychotic disorder, not otherwise specified (rule out major
depression with psychotic features) and a GAF of 40.  T142.


Plaintiff was admitted to the psychiatric unit at ECMC on September 16,
1998 after her parents called the police when she began screaming loudly and
slamming doors at her home.  T149-50.  She was prescribed Haldol, which was
changed to liquid form due to poor compliance, and which she subsequently refused to
take, causing her to become very agitated and psychotic, and necessitating seclusion.
T149.  She eventually agreed to try Haldol again, and recompensated.  T149.  She was
discharged to Transitional Services, Inc. on October 30, 1998.  T149.


Plaintiff's evaluation at Lake Shore Behavioral Health on December 17,
1998 revealed a cooperative individual with appropriate grooming and behavior, a
stable mood and bright affect, who related well socially.  T207.  She denied current
hallucinations or paranoia and appeared to possess fair insight and adequate
intelligence.  T207.  Her mood was described as anxious, with over-productive,
sometimes tangential speech.  T208.  Her GAF was assessed at 65, indicating some
mild to moderate symptoms.  T203.

On February 3, 1999, Thomas Dickinson, PhD, of Main Medical

Evaluations, completed a consulting psychiatric examination of the plaintiff.  T156.  Dr.

Dickinson

> found an alert and friendly and outgoing lady today with
> occasional loud replies and laughs.  [Her] speech was clear
> and logical but labile.  I noted rapid replies with some
> emotionality.  Beside her victorious manner and occasional
> giggles, we did not see any particular mannerisms or
> unusual behaviors.

T157.  Dr. Dickinson rated plaintiff's concentration level as "good but variable" and

found her "rate of insight into problem and situation is fair."  T157.  Dr. Dickinson's

> Impression today is . . . of past psychosis bouts with current
> picture of schizoaffective disorder (295.70) with mixed
> depression and delusional activity.  Prognosis is fair with her
> counseling and medication.  Concerning occupational
> adjustment, the client desires to find work and to complete
> her college education.  I doubt that she could handle
> complex tasks and detailed assignments with work
> pressures or organizing demands at this point.

T158.


Plaintiff's primary care physician, Dr. Dwight D. Lewis, M.D., completed a

Medical Report for Determination of Disability with respect to his evaluation of plaintiff

on March 12, 1999, noting the following symptoms: "depressed, auditory hallucinations,

isolating."  T194.  Dr. Lewis also opined that plaintiff had "a seriously impaired ability to

relate to other people."  T194.


On April 16, 1999, plaintiff's treating psychiatrist, Dr. Grace, completed a

New York State Office of Temporary and Disability Assistance Form and enclosed

medical records for plaintiff.  T159.  The form indicated that plaintiff was receiving

Intensive Psychiatric Rehabilitation four times a week; one-on-one counseling twice a

month; and psychiatrist visits every 8 weeks for her diagnosed schizoaffective disorder

and current symptoms of agitation.  T159.  The form also indicates that plaintiff appears

well groomed, alert, responsive, functional and goal directed with no phobias or

delusion, but exhibits pressured speech and a euphoric, broad affect.  T162.  Her

insight is described as fair; her judgment as normal.  T162.  Her ability to adapt, *e.g.*,

respond appropriately to changes in the work setting, be aware of hazards, travel/use

public transportation, set realistic goals, make plans independently, etc., were marked

as limited.  T164.  Dr. Grace found no limitations in plaintiff's understanding and

memory, sustained concentration or persistence, or social interaction.  T164.  Dr.

Grace's counseling notes indicate that plaintiff was bright and talkative on February 5,

1999; exhibited "no mood disturbance" and was "pleasant/cooperative" on Feburary 19,

1999; "and a bit giddy" on March 26, 1999, but "otherwise unremarkable." T166-69.


A Request for Medical Advice was referred to Madan Mohan, PhD, who

completed a psychiatric review of plaintiff's records on April 26, 1999 and opined that

> Claimant is currently involved in outpatient treatment
> with medication, Depakote, Cogentin and Risperdal.  She is
> also in counseling.  Review of medical records from the
> Counseling Center reveal good response, stable condition
> and no significant limitations.
>     Overall, the profile of limitations does not meet or
> equal any adult mental listing or the criteria for med. voc.
> allowance.

T190.  Dr. Mohan's Mental Residual Functional Capacity Assessment indicated that

plaintiff was moderately limited in her ability to carry out detailed instructions; maintain

attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  T188-89.

Plaintiff's counselor at Transitional Services, Inc., completed an evaluation on January 18, 2000 which opined that

> Joann's mental health condition, schizoaffective disorder,
> prevents her from performing on the job to the best of her
> ability.  Specifically, her ability to concentrate, comprehend
> information and tolerate stress are impaired by this
> condition.

T198.  The counselor described the plaintiff's abilities as follows: good ability to follow work rules, relate to co-workers, deal with the public, use judgment, and interact with supervisors; fair ability to function independently, understand, remember, carry out simple job instructions, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability; and poor or no ability to deal with work stresses, maintain attention/concentration, understand, remember and carry out complex job instructions and understand, remember and carry out detailed, but not complex job instructions.  T196-97.

A Mental Residual Functional Capacity Assessment purportedly signed by

Dr. Grace on January 21, 2000, opines that

> Claimant's mental health condition, schizoaffective disorder,
> prevents her from performing on the job to the best of her
> ability.  Her ability to concentrate, comprehend [sic] tolerate
> stress are impaired by this condition.

T201.  Dr. Grace found plaintiff markedly limited in her ability to remember locations

and work-like procedures; maintain attention and concentration for extended periods;

complete a normal workday and workweek without interruptions from psychologically

based symptoms and perform at a consistent pace without an unreasonable number

and length of rest periods; and respond appropriately to changes in the work setting.

T199-200.  He also found plaintiff moderately limited in her ability to understand and

remember detailed instructions; carry out detailed instructions; sustain an ordinary

routine without special supervision; work in coordination with or proximity to others

without being distracted by them; make simple work-related decisions; accept

instructions and respond appropriately to criticism from supervisors; and set realistic

goals or make plans independently of others.  T199-200.  Dr. Grace's counseling notes

indicate that plaintiff was "stable" on June 18, 1999; "hearing more voices" on June 25,

1999, prompting an increase in her dosage of Zyprexa; "stable" with "no complaints" on

July 30, 1999; and "stable" on November 5, 1999.  T218-21.


Hearing Testimony

At the time of the hearing, plaintiff was 27 years old.  T33.  She had

completed an Associates Degree in Criminal Justice and had been accepted to

complete her senior year of college, but had not attended classes because of "problems

-7-

being in crowds and . . . anxiety attacks and depression on and off . . . ."  T34.  She

hoped to ultimately obtain a clerical job in the booking or criminal records department of

a  law enforcement agency.  T40.


Plaintiff's past employment included clerical work from 1989 through

1993.  T36.  Plaintiff worked as a security operator for Sinotrol Security Systems for

more than a year beginning in 1994, which required her to arm or disarm security

systems and dispatch the police or fire department and make sure they had the correct

security code following an alarm at a customer's residence.  T37-38.  She worked as a

secretary for Catholic Charities in 1997 and also worked for a temporary agency

performing secretarial work, data entry, filing, faxing, and greeting customers.  T35, 37-

38.  Plaintiff was attending college during the time period she was working temporary

assignments.  T37.


Plaintiff stopped working in 1997 because

> I started hearing voices, like I explained, I heard a big crash
> and I started hearing voices and I became withdrawn and I
> experienced anorexia and at that time, depression,
> psychotic, everything, my world was crashing down on me.

T35.  Plaintiff testified that crowds bother her and that it is difficult for her to be around

people or to deal with work stressors, such as

> When I have a lot of projects that's due at the same time.
> When I have to do multiple tasks at the same time, when
> something is due within a set time period, then I have to do
> ABCD at the same time, plus get that project done, I just
> can't deal with that.

T52.  She explained that she would "start to sweat . . .  get anxious and . . . very antsy .

. . unstable at that time." T53.  She testified that she would have difficulty concentrating and "can't deal with a lot of things at one time . . . when I try to put things in order, seem [sic] like I could never get anything done."  T53.

At the time of the hearing, plaintiff was seeing her psychiatrist, Dr. Grace, every three months and was meeting with a one-on-one counselor every month and a group counselor twice a week.  T42-43.  Plaintiff was taking Lithium, 300 milligrams, twice a day, but was planning to ask her psychiatrist, Dr. Grace, to alter her medication because her symptoms were becoming more persistent and she was experiencing "more voices and more hallucinations."  T41-42.  She also testified that her level of depression was "increasing very much."  T42.  She explained that her depression prevents her from

> being able to function, do my daily routine, getting up, getting dressed and . . . participate [sic] in the community, get on the bus, going in for counseling sessions.  It just come [sic] on me real hard, that I just feel like why should I live or what should I do, and it seem [sic] like I can't shake it off, it stays on me that whole day.

T44.  Once or twice a week, she has a bad day where she stays in bed all day, and won't eat.  T44.  Approximately twice a week, the voices tell her "you're going to die, don't walk this way, don't go [sic] this, don't go to sleep or you're never going to wake up, things like that."  T44, 46.  Plaintiff hears the voices when she "gets stressed out or overwhelmed or . . . [sic] having a bad day."  T46.

Plaintiff lives in an apartment with a roommate.  T45.  They are responsible for completing their chores with assistance as needed from counselors at

Transitional Services, who visited five days a week until budget shortfalls forced them to cut back to twice a week.  T45, 49.  The counselors from Transitional Services

> make sure that we have food in our cupboard, and make sure everything is going okay with my roommate and any other situations I want to talk about.  My medications, my mental status, we'll talk about that.  It's basically a sit-down, and they distribute the mail also.

T50.  Plaintiff and her roommate are responsible for grocery shopping, but plaintiff's counselor has suggested that "they can take me if . . . it becomes real bad, I can't go out and go grocery shopping."  T46.  In addition to the scheduled visits, plaintiff has called Transitional Services for additional assistance approximately four or five times in the past year.  T51.   She testified that she usually tries to do one thing at a time, because otherwise she feels like she's "going around in a circle."  T54.

Plaintiff has a driver's license but does not have a car.  T46.  She gets around by bus.  T46.  Plaintiff spends her time going to the library (she reads a lot), and spends time with her family and in church.  T47.

Vocational expert ("VE"), James A. Phillips testified that plaintiff had engaged in three distinct occupational endeavors: secretary; receptionist; and security operator.  T56.  Each of these positions were classified as sedentary, but with different skill levels required.  T56.  When asked to assume a younger individual with an education beyond high school who was capable of understanding and remembering simple instructions and completing simple rote, repetitive one and two-step tasks and was able to "handle regular work stress environment" and  "appropriately relate to co-

workers and supervisors" as well as the public, the VE testified that such an individual could perform as a secretary and receptionist, but not as a security operator, because that position can involve periods of high stress.  T58.

When asked to assume that this individual could interact with co-workers and supervisors, but not the general public,  the VE testified that plaintiff would not be able to perform her past relevant work, but would be able to perform the job of file clerk or statistical clerks, as these positions are generally isolated to working with data, without public contact.  T58-60.  When asked to assume an individual who heard threatening voices, was easily distracted and unable to report to work approximately twice a week, the VE opined that such an individual would be unable to work at all. T61.

ALJ's Decision

The ALJ found that plaintiff suffered from a Schozoaffective Disorder with mixed depression and delusional features, but that the severity of this condition did not equal the appropriate listing.  T14.  With respect to residual functional capacity, the ALJ determined that plaintiff was "unable to handle complex tasks and detailed assignments which require one to organize her demands," but that such limitations would not preclude plaintiff from performing her past relevant work as a secretary/receptionist. T17.   In reaching this conclusion, the ALJ relied upon Dr. Grace's assessment of April 16, 1999.  T15.  With respect to the January 21, 2000 assessment, the ALJ found that

> it was obviously filled out by someone other than Dr. Grace,
> and although "Jeffrey Grace" is written in the signature

> block, it appears that Dr. Grace never reviewed this form
> because it is contradicted by his treatment notes and prior
> assessments (see [April 16, 1999 assessment]).

T15.  The ALJ also noted that the opinions of the social worker were not entitled to

controlling weight, as a social worker is not considered a treating medical source, and

afforded them little weight because they were inconsistent with the objective medical

evidence.  T15.


## DISCUSSION AND ANALYSIS

### I.    Scope of Judicial Review.

The Social Security Act states that, upon review of the Commissioner's

decision by the district court, "[t]he findings of the [Commissioner] as to any fact, if

supported by substantial evidence, shall be conclusive . . .."  42 U.S.C. § 405(g).

Substantial evidence is defined as evidence which a "reasonable mind might accept as

adequate to support a conclusion . . .."  *Consolidated Edison Co. v. NLRB,* 305 U.S.

197, 229 (1938), *quoted in Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Tejada v.

Apfel,* 167 F.3d 770, 773-74 (2d Cir. 1999); *Snell v. Apfel*, 177 F.3d 128, 132 (2d Cir.

1999).


Under these standards, the scope of judicial review of the Commissioner's

decision is limited, and the reviewing court may not try the case *de novo* nor substitute

its findings for those of the Commissioner.  *Richardson*, 402 U.S. at 401.  The court's

sole inquiry is "whether the record, read as a whole, yields such evidence as would

allow a reasonable mind to accept the conclusions reached" by the Commissioner.

*Sample v. Schweiker,* 694 F.2d 639, 642 (9th Cir. 1982). "Further, if supported by substantial evidence, the [Commissioner's] finding must be sustained, 'even where substantial evidence may support the plaintiff's position and despite that the Court's independent analysis of the evidence may differ from the [Commissioner's].'" *Martin v. Shalala,* No. 93-CV-898S, 1995 WL 222059, at *5 (W.D.N.Y. March 20, 1995), *citing Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).

Before applying the substantial evidence test, the Court first "reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d at 773; *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). "Failure to apply the correct legal standards is grounds for reversal." *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984); *see Grey v. Heckler*, 721 F.2d 41, 44 (2d Cir. 1983) (Commissioner's determination "cannot be upheld when based on an erroneous view of the law that improperly disregards highly probative evidence.").

## II.    **The Disability Standard**.

The standards set forth in the Social Security Act provide that a person will be found to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Act clarifies that "an individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his

age, education, and work experience, engage in any other kind of substantial gainful

work which exists in the national economy . . .." 42 U.S.C. § 1382c(a)(3)(B).


In assessing whether a claimant is suffering from a disability, the ALJ is

required to follow a five-step sequential evaluation process:

> 1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.
>
> 3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.
>
> 4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.
>
> 5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater*, 221 F.3d at 132, *citing DeChirico v. Callahan*, 134 F.3d 1177, 1179-80

(2d Cir. 1986); *see* 20 C.F.R. § 404.1520 (1999).

In the ordinary case, the application of the rules specified in 20 C.F.R. Pt. 404, Subpart P, which are also known as the medical-vocational guidelines or grids, satisfies the Commissioner's burden at the fifth step of the sequential evaluation process. *Rosa v Callahan*, 168 F.3d 72, 78 (2d Cir. 1999); *Bapp v Bowen*, 802 F.2d 601, 604 (2d Cir. 1986).  "For a claimant whose characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he is disabled."  *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

> But if a claimant's nonexertional impairments "significantly limit the range of work permitted by his exertional limitations" then the grids obviously will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments.  Accordingly, where the claimant's work capacity is significantly diminished beyond that caused by his exertional impairment the application of the grids is inappropriate.

*Id., quoting Bapp*, 802 F.2d at 605-06.

Nonexertional limitations are defined as limitations or restrictions other than strength demands which affect a claimant's ability to meet job demands.  20 C.F.R.§ 404.1569a(a).  Examples of nonexertional limitations or restrictions include "difficulty functioning because you are nervous, anxious, or depressed;" "difficulty maintaining attention or concentrating;" and "difficulty understanding or remembering detailed instructions." 20 C.F.R.§ 404.1569a(c).  A nonexertional impairment significantly dimishes a plaintiff's work capacity when the additional loss of work capacity is "beyond a negligible one" such that it "so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity."  *Bapp,* 802 F.2d at 606.  In such

circumstances, the Commissioner "must introduce the testimony of a vocational expert

(or other similar evidence) that jobs exist in the economy which [plaintiff] can obtain and

perform." *Id.* at 603.  "The ALJ's failure to do so requires a remand." *Gallivan v. Apfel*,

88 F. Supp.2d 92, 99 (W.D.N.Y. 2000).


**III.     Weight of Medical Opinion – Treating Physician Rule**

> The method by which the Social Security Administration is supposed to weigh medical opinions is set forth at 20 C.F.R. § 404.1527(d).  The regulations say that a treating physician's report is generally given more weight than other reports and that a treating physician's opinion will be controlling if it is "well-supported by medically acceptable [evidence] and is not inconsistent with the other substantial evidence in [the] record." *Id.* § 404.1527(d)(2).
>
> When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling.  And the less consistent that opinion is with the record as a whole, the less weight it will be given. *See Id.* § 404.1527(d)(4).  Moreover, some kinds of findings – including the ultimate finding of whether a claimant is disabled and cannot work – are "reserved to the Commissioner." *See Id.* § 404.1527(e)(1).  That means that the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.  A treating physician's statement that the claimant is disabled cannot itself be determinative.

*Snell*, 177 F.3d at 133.  Thus, "[w]hile the opinions of a treating physician deserve

special respect, they need not be given controlling weight where they are contradicted

by other substantial evidence in the record." *Veino v. Barnhart*, 312 F.3d 578, 588 (2d

Cir. 2002) (citations omitted).

When the Commissioner determines that a medical source opinion is not entitled to controlling weight, the Commissioner must provide "good reasons" for not crediting the opinion.  *Snell*, 177 F.3d at 133; *see* 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").  In addition, the Commissioner must consider relevant factors to determine the appropriate weight to accord that opinion.  *Shaw*, 221 F.3d at 134.  The factors that must be considered when the treating physician's opinion is not given controlling weight include: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist."  *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998); *see* 20 C.F.R. § 416.927(d).


"Unlike the opinions of treating physicians, opinions of state-agency medical consultants are not presumptively entitled to any particular weight."  *Torres v. Barnhart*, 2005 WL 147412, at *6 (E.D.N.Y. Jan. 24, 2005), *citing* 20 C.F.R. §§ 404.1527(f)(2)(I) & 416.927(f)(2)(i).  Such opinions must be evaluated in accordance with criteria governing all medical opinions, and the ALJ must explain the weight given to the opinions of a state agency medical consultant unless the opinion of the treating physician is afforded controlling weight.  *Id., citing*  20 C.F.R. §§ 404.1527(f)(2)(ii) & 416.927(f)(2)(ii).   An examining consulting physician's opinion is generally entitled to limited weight because a consulting physician's examination of a claimant is often brief, without the opportunity for review of a claimant's medical history.  *Crespo v. Apfel*, 1999

WL 144483, at *7 (S.D.N.Y. Mar. 17, 1999).  Opinions of nonexamining sources, including state agency medical consultants are entitled to even less weight than an examining medical consultant.  20 C.F.R. § 416.927(d)(1).  An ALJ is not permitted to "substitute his own judgment for competent medical opinion."  *Balsamo v. Chater*, 142 F.3d 75, 81 (2d 1998).


## IV.    Analysis

_____The Commissioner asserts that the ALJ's decision that plaintiff is not disabled is supported by substantial evidence and should be affirmed.  Dkt. #10. Plaintiff argues that the ALJ committed legal error by rejecting the January 21, 2000 assessment from Dr. Grace without further inquiry into its validity.  Dkt. #11.  Defendant responds that the ALJ, as the trier of fact, was entitled to resolve the conflicts between the conclusions of the assessment of April 16, 1999 and of January 21, 2000 and to make a factual finding that the January 21, 2000 assessment was not signed by Dr. Grace and did not comport with his treatment notes.  Dkt. #13.


It was error for the ALJ to determine that the January 21, 2000 assessment was "obviously filled out by someone other than Dr. Grace" without any attempt to contact Dr. Grace.  *See Riechl v. Barnhart*, 2003 WL 21730126, at *11 (W.D.N.Y. June 3, 2003) (If the ALJ had any doubts as to the source of the opinions presented as those of treating physician, he should have developed the record by seeking clarification from the treating physician).  Moreover, when an ALJ perceives inconsistencies between multiple reports of the same treating physician, the ALJ has an affirmative obligation to

request clarifying information.  *See Hartnett v. Apfel*, 21 F. Supp.2d 217, 221 (E.D.N.Y. 1998).

In *Clark v. Comm'r of Soc. Sec.*, for example, plaintiff's treating physician, Dr. Sookhu, provided a medical report indicating that plaintiff was capable of standing, sitting or walking for a maximum of eight hours per day. 143 F.3d at 117.  Approximately one year later, Dr. Sookhu prepared a second medical report indicating that plaintiff was capable of standing for one hour and sitting for four hours in an eight-hour day and that she needed to lie down when tired.  *Id.*  Dr. Sookhu did not provide any clinical findings, laboratory or test results in support of this second report.  *Id.*   The ALJ determined that Dr. Sookhu's second medical report was inconsistent with other medical evidence in the record, including Dr. Sookhu's first medical report and a  residual functional capacity assessment completed by a consulting physician which determined that plaintiff was capable of standing or walking about two hours in an eight-hour workday and sitting about six hours in an eight-hour workday.  *Id.*  The district court affirmed the ALJ's decision, noting that

> when confronted with two medical reports from Plaintiff's treating physician, neither of which is supported by clinical or objective findings, the ALJ reviewed all of the evidence in the record and found the [first] report to be more credible.  The [second] report was found to be controverted by substantial evidence and thus not entitled to controlling weight.

*Clark v. Callahan*, 1997 WL 291753, at *5 (S.D.N.Y. June 3, 1997).   The Court of Appeals reversed, stating that

> the ALJ should have acted affirmatively to seek out clarifying
> information concerning the perceived inconsistencies
> between Dr. Sookhu's two reports.  If asked, Dr. Sookhu
> might have been able to provide a medical explanation for
> why [plaintiff's] condition deteriorated over time.  Likewise,
> the doctor might have been able to offer clinical findings in
> support of his conclusion that [plaintiff] could not sit for most
> of the workday.  Dr. Sookhu's failure to include this type of
> support for the findings in his report does not mean that such
> support does not exist; he might not have provided this
> information in the report because he did not know that the
> ALJ would consider it critical to the disposition of the case.
> There is, to say the least, a serious question as to whether
> the ALJ's duty to develop the administrative record was
> satisfied in this case.

*Id.* at 118 (internal quotation omitted).


In an analogous case involving a plaintiff diagnosed with dysthymia and personality disorders, plaintiff's psychiatrist completed a residual functional capacity assessment indicating a GAF of 65 and a marked limitation in plaintiff's ability to perform complex tasks in a work setting as well as moderate limitations in plaintiff's ability to understand, remember, and carry out instructions; respond appropriately to supervision and co-workers; respond to customary work pressures; satisfy an employer's normal quality, production, and attendance standards; and perform simple tasks in a full-time work setting.  *Richardson v. Apfel*, 44 F. Supp.2d 556, 558-59 (S.D.N.Y. 1999).   More than one year later, plaintiff's psychiatrist presented a letter to the Appeals Counsel indicating that plaintiff's "chronic depression persists, with anxiety and sleep difficulties, leading her to tend to be self-isolative."  *Id.* at 559.  The psychiatrist also remarked that, "though pleasant and cooperative," plaintiff "is unable to manage the on-going

responsibilities that even a work training program would involve, let alone – a work

situation." *Id.*  Noting that plaintiff's treatment goals revolved around "improved daily

self-care," such as leaving her apartment a few times a week and eating on a regular

basis, the psychiatrist concluded that plaintiff "cannot take on the responsibility of a full-

time job." *Id.*   The Appeals Council refused to consider this evidence and affirmed the

ALJ's denial of disability.  *Id.* at 561.  The district court analogized the case to *Clark* as

follows:

> As in *Clark*, Richardson submitted two reports by her treating
> physician dated approximately one year apart.  Both reports
> described the same symptoms, but the second report
> assessed Richardson's impairments to be more severe in
> nature.  In the first report, Dr. Camille identified Richardson
> as having a dysthymia and a personality disorder, but stated
> that Richardson only had "moderate" limitations in her ability
> to work with others and follow orders.  The ALJ properly
> considered this as evidence that Richardson did not have a
> disabling nonexertional impairment, as the term "moderate" is
> defined as "[a]ffects but does not preclude ability to function."
> The second report by Dr. Camille described the same
> psychological disorders, but stated categorically for the first
> time that Richardson could not take on the responsibilities of
> a work situation.  This new evidence should not have been
> dismissed by the Appeals Council on the grounds that the
> report did not mention clinical or objective findings because
> the Appeals Council, which must follow the same rules as the
> ALJ follows in considering opinion evidence, had an
> affirmative obligation to make an attempt to secure the
> additional clinical or objective support it required from Dr.
> Camille.

*Id.* at 563 (internal citations omitted).  "Because the Commissioner did not discharge his

affirmative duty to fully develop the administrative record with regard to Richardson's

mental impairments and failed to give a valid reason for not doing so," the district court

found "that the Commissioner committed legal error" and remanded the case.  *Id.* at

564.

As in the aforementioned cases, it was error for the ALJ in this matter to choose between conflicting reports of functional capacity by the same treating physician without affording that physician the opportunity to explain the inconsistency.  Although the Commissioner attempts to distinguish these cases on the ground that Dr. Grace's treatment notes were part of the administrative record and afforded the ALJ grounds for assessing the credibility of the conflicting reports, the Court is not persuaded that Dr. Grace's counseling notes provide any basis for the ALJ to differentiate between Dr. Grace's conflicting opinions as to plaintiff's limitations.  Accordingly, this case must be remanded to afford Dr. Grace the opportunity to explain and/or clarify his opinions regarding plaintiff's condition.

## CONCLUSION

Based on the foregoing, the Commissioner's motion for judgment on the pleadings (Dkt. #9), is denied; the plaintiff's motion for judgment on the pleadings seeking reversal of the Commissioner's decision and remand for a new administrative hearing (Dkt. #11), is granted; and this matter is remanded to the Commissioner, pursuant to 42 U.S.C. § 405 (g), for further proceedings in accordance with this Decision and Order.

**SO ORDERED.**

DATED:      Buffalo, New York
            November 15, 2005

                              S/ H. Kenneth Schroeder, Jr.
                              H. KENNETH SCHROEDER, JR.
                              United States Magistrate Judge